UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONALD RAYMOND CRAMER, III      )
                                )
          Plaintiff,            )
                                )
     v.                         )     No. 4:08 CV 840 DDN
                                )
MAREN ENGINEERING CORP.,        )
                                )
          Defendant.            )

## MEMORANDUM AND ORDER

This action is before the court on the motions of defendant Maren
Engineering Corp. to exclude the testimony and expert report of James
Blundell (Doc. 31), for summary judgment (Doc. 28), and for summary
judgment on the issue of punitive damages (Doc. 33). Also before the
court is the motion of plaintiff, Donald Raymond Cramer, III, to
voluntarily dismiss two paragraphs of his complaint (Doc. 44). The
parties have consented to the exercise of plenary authority by the
undersigned United States Magistrate Judge pursuant to 28 U.S.C.
§ 636(c). (Doc. 11.) The court held a hearing on these matters on
August 28, 2009.

## I. BACKGROUND

Donald Cramer brought this action against Maren Engineering (Maren)
after he was injured while operating a baling machine at work.[1] (Doc.
1.) As part of his complaint, he alleges Maren designed, manufactured,
and distributed the baling machine in which he was injured. (Id. at
¶ 8.) He further alleges the baling machine was defective and
unreasonably dangerous at the time of its design, manufacture, and sale.
(Id. at ¶ 10.) In Count I, he asserts a claim of strict liability, both
in the design of the baler, and for failure to provide adequate
warnings. (Id. at 3-5.) In Count II, he asserts a claim for

---

[1]A baler is a machine used for packing, compressing, wrapping, or
making bundles. Salgado-Santiago v. Am. Baler Co., 394 F. Supp. 2d 394,
397 n.2 (D.P.R. 2005).

negligence, both in the design of the baler, and for failure to provide adequate warnings. (<u>Id.</u> at 5-8.) Maren admits it manufactured the baling machine in question, but denies the remaining allegations. (Doc. 5.)

The court has original jurisdiction based on the diversity of the parties' citizenship and because the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

## II.  EXPERT REPORT OF JAMES KENNETH BLUNDELL

On January 28, 2009, James K Blundell, Ph.D., prepared an expert report for Cramer. (Doc. 32, Ex. 1.) In preparing his report, Blundell inspected the machine, and reviewed dozens of photographs, legal documents, safety and training documents, and the depositions of Donald Cramer and Gregory Herndon. (<u>Id.</u> at 1.) In writing his report, Blundell discussed how the accident happened and how the baler worked, before going into his safety analysis and conclusions. (<u>Id.</u> at 1-4.)

On the day of the accident, Cramer had slipped and fallen backwards onto the conveyor belt, which carried his leg towards the closing discharge door. (<u>Id.</u>) Cramer's leg became trapped under the door, breaking his right ankle. (<u>Id.</u>) As the door continued to close, he was able to pull his upper body up and out of the way of the door, at which point, a co-worker hit an emergency stop button. (<u>Id.</u> at 1-2.)

On April 19, 1984, Maren Engineering shipped the baling machine, model #122, to Alton Packaging.[2] (<u>Id.</u> at 2.) According to a general assembly drawing of the #122-S baler, the machine had a pair of expanded metal panels on either side of the area where the discharge door opened and closed, but it did not appear that these panels enclosed the area within which the discharge door opened and closed. (<u>Id.</u>) A photograph taken at Alton Packaging in March 1985, shows panels located in the vicinity of the discharge door, but with a gap between the edge of the door and the panel. (<u>Id.</u>) From the photo, the installation of the

---

[2]Alton Packaging has been known as Altivity Packing Company, Smurfit Stone Container Corporation, Graphic Packaging International, and several other names. (Doc. 29 at 2 n.1). For clarity, Cramer's employer will only be referred to as Alton Packaging.

panels looked different than the location described in the general assembly drawing.  (<u>Id.</u>)  In December 1988, Alton Packaging shipped the baler back to Maren for extensive repairs, and this apparently included shipment of the panels.  (<u>Id.</u>)  In April 1989, Maren returned the baler, though apparently without the panels.  (<u>Id.</u>)

In his report, Dr. Blundell noted that the belt conveyor created a shear point with the closing discharge door.  (<u>Id.</u> at 3.)  A shear point occurs wherever there is relative motion between moving parts of machinery.  (<u>Id.</u>)  On the day of the accident, Dr. Blundell wrote that the "shear point was unguarded and had no accessible emergency stop system."  (<u>Id.</u>)  According to American National Standards Institute (ANSI) specifications for belt conveyors, "[n]ip and shear points shall be guarded."  (<u>Id.</u>)  Based on this evidence, Dr. Blundell concluded that the Maren baler was defective and unreasonably dangerous for four reasons:

    (1)  it possessed an unguarded shear point created by the discharge door and the belt conveyor;
    (2)  it lacked an accessible emergency stop;
    (3)  it was not designed with an integral guard related to the discharge door; and
    (4)  it created excessive closing pressures capable of trapping an operator such as Mr. Cramer.

(<u>Id.</u> at 4.)


### III.  MOTION TO EXCLUDE TESTIMONY

Maren Engineering moves to exclude the testimony and export report of Dr. Blundell.  Maren argues that each of his opinions on the baling machine is unreliable and irrelevant under Rule 702.  The company also notes that he has not tested the viability of any of his conclusions. (Doc. 32.)

In response, Cramer argues that a number of other courts have found Dr. Blundell qualified to testify as an expert on the topic of machine guarding and defective design.  He argues that Dr. Blundell's opinions are reliable, relevant, and trustworthy, noting that his methods and techniques have been tested and accepted.  (Doc. 43.)

## IV. DISCUSSION

**Admitting Expert Testimony**

In diversity cases, federal law governs the admissibility of expert testimony. Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005). To be admissible, the proponent of the evidence must prove that the expert testimony is both reliable and helpful, and that the expert is qualified to be a witness. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note. This showing must be made by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171, 176 (1987). Rule 702 of the Federal Rules of Evidence guides the court in determining the admissibility of expert testimony.

Under Rule 702, the court must first find that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. If the court makes this finding, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion, provided (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case. Id. An expert must explain how he arrived at his or her conclusions; the trial court may not simply take the expert's word for it. Fed. R. Evid. 702 advisory committee's note; Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005).

Rule 702 incorporates the rulings of the Supreme Court's decisions in Kumho Tire and Daubert. Fed. R. Evid. 702 advisory committee's note. In those cases, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). In exercising this gatekeeping responsibility, the trial judge must follow the standards of Rule 702, but can also consider the four factors

found in <u>Daubert</u>.[3]  Fed. R. Evid. 702 advisory committee's note; <u>Kumho</u>
<u>Tire</u>, 526 U.S. at 140-41 ("[T]he test of reliability is 'flexible,' and
<u>Daubert's</u> list of specific factors neither necessarily nor exclusively
applies to all experts or in every case.").  Rule 702 reflects an
attempt to liberalize the rules governing the admission of expert
testimony, and the rule remains one of admissibility rather than
exclusion.  <u>Shuck v. CNH Am., LLC</u>, 498 F.3d 868, 874 (8th Cir. 2007).

**Dr. Blundell's Testimony on Safety Features**

Maren moves to exclude the testimony of Dr. Blundell.[4]  Based on
his report, Dr. Blundell is prepared to testify that the baler was
unreasonably dangerous because its design lacked certain safety
features.

An expert does not have to manufacture a new device or prototype
for his or her opinion to be admissible.  <u>Unrein</u>, 394 F.3d at 1012.
Instead, the critical question in a <u>Daubert</u> motion is whether the
expert's opinion is sufficiently grounded as to be helpful to a jury.
<u>Id.</u>  The expert's opinion must contain some proof of its reliability.
<u>Id.</u>  Simply put, an expert proposing safety modifications must
demonstrate, <u>by some means</u>, that the proposed features would protect the
machine's operators, while not interfering with the machine's utility.
<u>Id.</u>  An expert may be able to satisfy this requirement by (1) testing

---

[3]In <u>Daubert</u>, the Supreme Court listed four non-exclusive factors
for assessing the reliability of scientific expert testimony: (1)
whether the expert's theory or technique can or has been tested; (2)
whether the theory has been subjected to peer review and publication;
(3) whether the technique has a known rate of error or standards
controlling its operation; and (4) whether the theory enjoys general
acceptance within the relevant scientific community. <u>Daubert</u>, 509 U.S.
at 592-94.

[4]Dr. Blundell's expert testimony has been both admitted and
excluded by courts of this circuit. <u>E.g.</u>, <u>Sappington v. Skyjack, Inc.</u>,
512 F.3d 440, 453-54 (8th Cir. 2008) (admitting his testimony); <u>Cowens</u>
<u>v. Siemens-Elema AB</u>, 837 F.2d 817, 820 (8th Cir. 1988) (excluding his
testimony); <u>Foster v. Minster Mach. Co.</u>, No. 4:07 CV 1331 SNLJ, at *11
(E.D. Mo. Feb. 4, 2009) (admitting his testimony); <u>Mouser v.</u>
<u>Caterpillar, Inc.</u>, No. 4:98 CV 744 FRB, 2000 WL 35552637, at *8-*9 (E.D.
Mo. Oct. 6, 2000) (excluding his testimony).

the proposed safety device, (2) preparing drawings or designs featuring the proposed modifications, (3) pointing to similar machinery already using the proposed features, or (4) citing studies regarding the effectiveness of such features. Id. at 1011-12; Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1084 (8th Cir. 1999); Dancy v. Hyster Co., 127 F.3d 649, 651 (8th Cir. 1997); Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir. 1995); Shaffer v. Amada Am., Inc., 335 F. Supp. 2d 992, 996 (E.D. Mo. 2003). Drawings should be engineering drawings or prototypes, and not simply a series of rough sketches. Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir. 1996).

In Unrein, the expert's report stated that a sander was defective because it lacked proper safeguarding, such as a continuous, emergency trip cord, and a braking device that would have slowed the conveyor belt. Unrein, 394 F.3d at 1010. The district court excluded the expert's testimony, and on appeal, the Eighth Circuit affirmed, noting the expert's opinion was unreliable. Id. at 1009, 1012. In particular, the Eighth Circuit found the expert had failed to develop or test his theories; he had not prepared any drawings of his modifications or presented photographs of similar machinery with the proposed modifications. Id. at 1012.

In Jaurequi, the Eighth Circuit affirmed the exclusion of the expert's testimony for similar reasons. Jaurequi, 173 F.3d at 1084. In that case, the expert's report stated that a corn head on a combine was defective because it lacked an awareness barrier. Id. In affirming the exclusion of the expert's testimony, the Eighth Circuit noted that he had not attempted to construct or draw the suggested device, had not tested the utility or compatibility of the proposed safety device, and was unable to point to any other manufacturer with a similar device. Id. "In short, [the expert] has provided no basis for us to believe that his opinions are anything more than unabashed speculation." Id.

Dancy, Peitzmeier, and Pestel are no different. In each case, the plaintiff's expert proposed the addition of a guard or other safety device on the allegedly defective product, and in each case the courts found the expert's testimony wanting. Dancy, 127 F.3d at 651 ("Dr. Forbes had not tested this theory in any way, had not seen this type of

device on a forklift or any other similar machine, and had not even designed the device he suggested would have prevented Plaintiff's injury."); Peitzmeier, 97 F.3d at 297 ("Milner concedes that he has neither designed nor tested for safety or utility any of the proposed safety devices that he claims are missing from the [defendant's machine]."); Pestel, 64 F.3d at 384 ("Mr. Vidal had not tested his guard" and was not prepared "to show that such a guard was ready for the market - his design was not finished.").

In contrast, when an expert has adequately tested his or her theories, courts have admitted that expert's testimony. See Lauzon v. Senco Prods., Inc., 270 F.3d 681, 688-89 (8th Cir. 2001); Chism v. CNH Am. LLC, No. 2:07 CV 150 JLH, 2009 WL 890524, at *3 (E.D. Ark. Mar. 30, 2009). In Lauzon, for instance, the plaintiff's expert conducted extensive testing of the allegedly defective nail gun. Lauzon, 270 F.3d at 688-89. In particular, the expert measured nail speed from various distances, the trigger force of the nail gun, and the force needed to activate the bottom contact point. Id. at 689. The expert also reproduced a section of the roof where the plaintiff was injured, and reenacted and recorded the tasks the plaintiff was performing. Id.

In Chism, the expert's report stated that a hay baler was defective because it lacked shields and certain warning devices. Chism, 2009 WL 890524, at *2. In support of this theory, the expert designed a guard, and then had a farmer test the guard by baling nearly 500 bales of hay with the proposed modification. Id. at *3. In addition, the expert was able to point to similar guards on similar machinery built by other manufacturers. Id. The expert also tested his proposed emergency stop (e-stop) device. Id. at *4. The expert designed and installed the e-stop device on three different round balers. Id. Once installed, he tested the device by tripping the e-stop at various locations, including in an actual field, while baling various materials. Id. at *5. Given this extensive testing, the court admitted the expert's testimony. Id.

Looking to the case law, Dr. Blundell's opinions do not satisfy the reliability requirements of Rule 702. In his first opinion, Dr. Blundell believes the baler was defective because it possessed an unguarded shear point. (Doc. 32, Ex. 1 at 4.) To make the shear point

safer, he believes there should have been a 3/8-inch gap between the bottom of the door and the conveyor belt. (Doc. 32, Ex. 2 at 24; Blundell depo. at 92-93.) Yet, Dr. Blundell has not tested this opinion, and cannot say whether the baler would have remained functional with a 3/8-inch gap. (Id.) Indeed, James Sprague, Ph.D., testified that such a small gap would tear up the conveyor belt within weeks of use, while doing little to nothing to eliminate the possibility of foot entrapment. (Doc. 32, Ex. 8 at 3-6; Sprague depo. at 100-02.)

In his second opinion, Dr. Blundell proposes an accessible emergency stop, consisting of a pull cord around the discharge door. (Doc. 32, Ex. 1 at 3.) In his deposition, he indicated that he had seen machines with an emergency cord accessible from any point on the machine. (Doc. 32, Ex. 2 at 26; Blundell depo. at 100.) Yet, Dr. Blundell has not provided any photographs or illustrations of such a machine. He has not prepared or designed any models or drawings of his proposed emergency stop. Finally, he has not tested the viability of his proposed modification. There is no indication Cramer would have been able to reach this emergency stop, or that the proposed stop would not have adversely affected the baler's operation. See Wagner v. Hesston Corp., No. Civ. 03-4244 JNE/JGL, 2005 WL 1540135, at *7 (D. Minn. June 30, 2005), aff'd, 450 F.3d 756 (8th Cir. 2006) (finding the expert's testimony "particularly unreliable" where there was no indication the expert evaluated "whether an operator entangled in the compression rolls would be able to reach the emergency stop cable, or if he could reach the cable, whether he would be able to activate it after being injured.").

In his third opinion, Dr. Blundell believes the baler's discharge door should have been built with an integrated guard. (Doc. 32, Ex. 1 at 4.) In his deposition, he notes that an integrated guard would need to be "tested against the swing of the door and any impact that the door might have. . . ." (Doc. 32, Ex. 2 at 25; Blundell depo. at 95.) Yet, there is no indication Dr. Blundell ever tested his theory. See Masters v. Hesston Corp., 291 F.3d 985, 992 (7th Cir. 2002) (affirming exclusion of an expert's testimony where he "did no design work, no testing, and no measurements of a proposed guard [for a hay baler]."). Without such

testing, he has no knowledge of how an integrated guard would affect the baler's operation, or that an integrated guard would have prevented Cramer's injuries. See Wagner, 2005 WL 1540135, at *4 (excluding the expert's testimony where there was no evidence that the proposed guard would actually prevent further injuries). Dr. Blundell has not even designed a prototype or diagram of his proposed guard. See Jauregui, 173 F.3d at 1080 (noting the expert had not "attempted to construct or even draw the suggested device, much less test its utility as a safety device or its compatibility with the [machine's] proper function."). More to the point, Dr. Blundell has never seen the baler operate; he has never seen a bale move through the door, seen the door open or close, or seen the conveyor belt operate. (Doc. 32, Ex. 2 at 13; Blundell depo. at 48.) He has not talked to anyone at Alton Packaging about how the baler operates. (Doc. 32, Ex. 2 at 13-14; Blundell depo. at 49-50.)

In his fourth opinion, Dr. Blundell states that the discharge door created excessive closing pressures. (Doc. 32, Ex. 1 at 3-4.) But again, Dr. Blundell has not tested whether a lower closing pressure would be feasible. See Shaffer, 335 F. Supp. 2d at 995 (excluding the expert's testimony where he had no knowledge that his proposals would not interfere with the normal operation of the machine). Dr. Sprague testified that limiting the force on the door was "exceedingly impractical" for a number of reasons. (Doc. 29, Ex. 17 at 8; Sprague depo. at 98.) More to the point, Dr. Blundell never measured the baler's closing pressure during his visit to the factory, and did not know what the closing pressure was on the day of the accident. (Doc. 32, Ex. 2 at 31; Blundell depo. at 118, 121); see also Shaffer, 335 F. Supp. 2d at 996 (criticizing the expert for failing to quantify his findings).

An expert proposing safety modifications must demonstrate that the proposed features would protect the machine's operators but not interfere with the machine's utility. Unrein, 394 F.3d at 1012. Dr. Blundell has not done so. Other than his own assurances, Dr. Blundell has not provided any proof that his safety proposals are feasible. He has not tested his theories, provided drawings or designs of his proposals, submitted relevant studies, or noted existing machinery

incorporating his proposals.  He never observed the baler in operation, and was unable to quantify the closing pressure of the doors.  Dr. Blundell's proposed safety modifications are not based upon sufficient data and are not the product of reliable methods.  His testimony on this subject would not assist the jury.

**Dr. Blundell's Other Testimony**

Beyond his proposed safety modifications, Dr. Blundell is prepared to testify that the baler was unreasonably dangerous because it possessed an unguarded shear point.  This testimony satisfies the reliability requirements of Rule 702.

A shear point is any place where it is possible to be caught between the moving parts of a machine, or between a moving part and the material of the machine.  State v. Indus. Comm'n of Ohio, No. 79AP-486, 1980 WL 353225, at *2 (Ohio Ct. App. Jan. 17, 1980).  When he inspected the baler, Dr. Blundell found that the gap between the moving conveyor belt and the bottom of the discharge door created a shear point.  (Doc. 32, Ex. 1 at 3.)  According to his report, ANSI dictates that nip and shear points on a conveyor belt must be guarded.  (Id.)  During the hearing, both parties agreed that there was no guard in place at the time of Cramer's accident.  Both parties also agree that Dr. Blundell is qualified, as a mechanical engineer, to offer opinions related to machine guarding.  (Doc. 32 at 2.)  Given Dr. Blundell's professional background, his own observations, and his reliance on the ANSI standards, Dr. Blundell's opinion that the baler was unreasonably dangerous because it possessed an unguarded shear point is reliable.  See Padillas v. Stork-Gamco, Inc., No. Civ. A. 95-7090, 2000 WL 1470210, at *4 (E.D. Pa. Oct. 2, 2000) (allowing the expert to testify that the product was "unsafe and defective because of the absence of any cover or barrier," but excluding the expert from giving his opinion as "to the safer alternative designs or the adequacy of the [proposed] guard or cover, or that any of these devices would have prevented the injury to plaintiff.").  Dr. Blundell's testimony on this subject would assist the jury.

The motion to exclude the expert testimony of Dr. James Blundell is granted in part, and denied in part.


## V.  MOTION FOR SUMMARY JUDGMENT

Maren Engineering moves for summary judgment on all claims.  First, Maren argues Cramer cannot prevail on his strict liability claim.  In particular, the company argues the baler was reasonably safe at the time of sale because it was sold with a door guard that was installed around it.  If the door guard had still been installed at the time of the accident, the company argues it would have prevented the plaintiff's injuries.  Maren also argues that the baler was modified, and that these third-party modifications relieve it of liability.  Second, Maren argues Cramer cannot prevail on his failure to warn claim because he was aware of the baler's inherent danger, and that additional warnings would not have altered his behavior.  Third, Maren argues Cramer cannot prevail on his negligence claim because the baler did not contain any hidden or latent defects.  (Docs. 29, 47.)

In response, Cramer argues genuine issues of material fact remain for trial.  First, Cramer argues the baler was defective at the time of sale.  In particular, he argues there is no evidence Maren ever installed a door guard with the baler.  Even if there was a door guard, Cramer argues that Dr. Blundell's expert testimony indicates the baler was defective for other reasons.  Cramer also argues that any third-party modifications were not significant enough to insulate Maren from liability.  Second, Cramer argues that a general awareness of a machine's dangers does not defeat a failure to warn claim.  Third, Cramer argues that the open and obvious nature of a defect is not sufficient to grant summary judgment on the negligence claim.  (Doc. 45.)


## VI.  STATEMENT OF UNDISPUTED FACTS

On January 25, 1984, Steelcraft Corporation ordered two #122 Automatic High Density Baling Presses from Maren, which were to be

delivered to Alton Packaging in Pacific, Missouri.  (Doc. 29, Ex. 1.)
The purchase order also included two automatic tiers, two automatic
doors and extractors, and several other parts.  (Id.)  The purchase
order did not explicitly include any mention of a door guard or cage.
(See id.)

On April 19, 1984, Maren shipped the first baler, along with other
materials, to Alton Packaging.  (Doc. 29, Ex. 6.)  Cramer alleges he was
injured on this first baler.  (See Doc. 46 at ¶ 6.)  On April 30, 1984,
Maren shipped the second baler, along with other materials, to Alton
Packaging.  (Doc. 29, Ex. 7.)  This second shipment included an
operation and maintenance manual for the #122 Automatic Baler.  (Doc.
29, Exs. 8, 9.)  The Safety Bulletin page for the manual noted that "ALL
moving machinery has pinch points, Maren has provided guards on them
where possible; some, because of the operating characteristics, cannot
be guarded.  Operators must use caution when closing doors, etc." (Doc.
29, Ex. 9 at 4.)

A general assembly drawing of the #122-S Maren Baler with electric tier, automatic door, and electric extractor provided descriptions and measurements of the component parts of the #122-S baler (see below). (Doc. 29, Ex. 2.) The drawing was dated January 20, 1983, and included a design of a "Bale Extractor & Auto Door Guard," which enclosed the discharge door and a portion of the electric conveyor belt. (Id.) A detailed drawing of the "Auto Door Guard (Standard)" showed the door guard measured 60 and 1/4 inches across, 66 inches high, and was to be anchored to the floor with eight 5/8-inch bolts. (Doc. 29, Ex. 3 at 1.) The drawing was dated October 30, 1980. (Id.) According to Gregory Herndon, Maren would have shipped these drawings with the equipment it



sent to Alton Packaging. (Doc. 29, Ex. 5 at 8; Herndon depo. at 60.)

After receiving the balers, Steelcraft's mechanics installed the machines at Alton Packaging. (Doc. 29, Ex. 10.) The mechanics also installed two Steelcraft Cyclone Separators that delivered the scrap

material to the balers. (Id.) According to Gregory Herndon, Maren supplied a cage (the door guard) to fit around the automatic discharge door for the first baler. (Doc. 29, Ex. 5 at 6; Herndon depo. at 58.) Maren did not install the cage, but Herndon believed that the company installing the baler did, in fact, also install the cage based on photographs he had seen. (Doc. 29, Ex. 5 at 8-10; Herndon depo. at 60, 64, 65.) These undated photographs depict an orange cage around the discharge door of the first baler. (Doc. 29, Ex. 11.)

A promotional brochure featuring the #122 Automatic Baler also contained a photograph of a door guard. (Doc. 29, Ex. 15 at 3.) The caption for the photograph read, "Completely Safe Operation," and noted that "A cage is provided around the discharge door to prevent access to discharge door area while door is in operation." (Id.)

Between May 1984 and January 1988, Maren employees made fourteen service trips to Alton Packaging. (Doc. 46, Exs. 19-32.) One of these service calls was in response to complaints that the bale extractor was not shutting off. (Doc. 46, Ex. 21 at 26.) The service reports from these fourteen visits made no mention of any guard or cage for the automatic discharge door. (See Doc. 46, Exs. 19-32.) On December 16, 1988, Maren wrote to Alton Packaging, informing the company that it would be repairing the baler at its Illinois facility. (Doc. 46, Exs. 33-34.)

On April 14, 1989, Maren shipped the repaired baler back to Alton Packaging. (Doc. 46, Ex. 34.) None of the repair or shipping documents made any mention of a door guard. (See Doc. 46, Exs. 33, 34.) After delivery of the baler, Maren continued to service and repair the machine. Between September 1989 and October 1995, Maren employees made eight service trips to Alton Packaging. (Doc. 46, Exs. 35-42.) The service reports from these visits made no mention of any guard or cage for the automatic discharge door. (See id.) Maren also provided replacement parts for the baler. (Doc. 46, Ex. 14 at 46; Herndon depo. at 123.) After October 1995, up until the date of the accident, no one from Maren came to inspect or repair the baler at Alton Packaging. (Doc. 29, Ex. 5 at 14-15; Herndon depo. at 122-23.)

James Bonner, a Maren employee, did not recall ever seeing a cage surrounding the automatic door during any of his service visits to Alton Packaging. (Doc. 46, Ex. 11 at 4-5; Bonner depo. at 22-23.) In all the time he worked at Alton Packaging, Cramer never saw a cage around the door or conveyor. (Doc. 46, Ex. 12 at 27-28; Cramer depo. at 109-110.)

Several other employees at Alton Packaging also did not remember seeing any such guard around the automatic discharge door of the first baler. Rose Voyles did not spend a lot of time in the baling area, but she still walked past the first baler every day. (Doc. 46, Ex. 5 at 38-39; Voyles depo. at 30-31.) Yet, she did not remember seeing a cage around the automatic door of the first baler. (Id.) From 1981 to 1988, James Perrine worked in the department located just across the aisle from the first baler. (Doc. 46, Ex. 6 at 41-42.) From 1989 to 1991, he personally operated the first baler. (Id.) But from 1981 until the time of the accident, Perrine swore that there "was never a cage or guard surrounding the automatic door of Baler No. 1." (Id.) From 1987 until February 2009, George Rogers walked by the first baler on a weekly basis. (Doc. 46, Ex. 7 at 43-44.) In all that time, he never saw any type of cage or guard surrounding the automatic discharge door of the first baler. (Id.)

**The Accident**

On November 6, 2006, Cramer was working as a baler, a position he had held for a little over a year. (Doc. 29, Ex. 12 at 3-4; Cramer depo. at 37, 42.) Cramer knew the baler operated automatically, and had been told, generally, to be aware of pinch points, and to keep his body and clothing clear of the machine's moving parts. (Doc. 29, Ex. 12 at 5, 39; Cramer depo. at 66, 114.)

On the day of the accident, Cramer was attempting to pull loose a wire that was sticking out the side of the baler. (Doc. 29, Ex. 12 at 9; Cramer depo. at 70.) With his back to the machine, he turned to pull the wire away from the baler. (Doc. 29, Ex. 12 at 19; Cramer depo. at 80.) As he pulled, his body twisted, and when the wire finally popped out, he accidentally fell, and his buttocks landed on the conveyor and into the path of the automatic door. (Doc. 29, Ex. 12 at 21-22; Cramer

depo. at 82-83.)  With his buttocks on the conveyor, Cramer pulled his
right foot up, and tried to push himself off with his foot.  (Doc. 29,
Ex. 12 at 31; Cramer depo. at 105.)  Unfortunately, his foot became
stuck, and he was unable to move his leg.  (Doc. 29, Ex. 12 at 32-33;
Cramer depo. at 106-07.)  As he faced the baler, Cramer put his hands
out and started screaming.  (Doc. 29, Ex. 12 at 33; Cramer depo. at
107.)  A co-worker rushed over and stopped the baler, just as the
automatic door was closing on his right thigh.  (Doc. 29, Ex. 12 at 33-
34; Cramer depo. at 107-08.)  Cramer's right foot had been pinned
underneath the door.  (Id.)

The baler had one emergency stop, located thirty inches from the
automatic door, and one emergency cable, located sixty inches from the
automatic door.  (Doc. 46, Ex. 14 at 40; Herndon depo. at 73.)  When
pulled, the emergency cable shut down the power to the baler.  (Id.)
The baler did not have any type of sensor that would prevent the door
from automatically closing on an obstruction in the doorway.  (Doc. 46,
Ex. 14 at 43-44; Herndon depo. at 90-91.)  At the time of the accident,
there was no cage or door guard around the baler.  (Doc. 29, Ex. 13.)

If a cage had been positioned around the baler, Cramer thought he
would have fallen "into the cage," which would have prevented him from
ending up on the conveyor belt.  (Doc. 29, Ex. 12 at 36-37; Cramer depo.
at 110-11.)  Dr. Sprague shared this opinion, concluding that a cage
would have prevented Cramer from falling backwards onto the conveyor,
and would have prevented the accident.  (Doc. 29, Ex. 19 at 12.)  For
his part, Dr. Blundell believed a guard might have been able to prevent
Cramer from falling onto the conveyor. (Doc. 29, Ex. 14 at 16; Blundell
depo. at 126.)  Dr. Blundell and Dr. Sprague both believed the door
should have been guarded.  (Doc. 32, Ex. 1 at 4; Doc. 46, Ex. 16 at 2;
Sprague depo. at 65.)  James Bonner also thought the automatic door
should have been guarded.  (Doc. 46, Ex. 11 at 10; Bonner depo. at 44.)

At the time of the accident, the conveyor system was operating
differently than manufactured.  (Doc. 29, Ex. 4 at 5; Bonner depo. at
47.)  According to Maren's Operating and Maintenance Instructions, an
electric eye and counter operated together to initially energize the
conveyor belt.  (Id. Doc. 29, Ex. 9 at ¶¶ 6-13.)  When a bale moved into

a position blocking the electric eye, a counter began counting down from its setting. (<u>Id.</u>) When the counter hit zero, the extractor motor turned on, and began pulling the bale out of the chamber and down the conveyor. (<u>Id.</u>) When the bale cleared the position of the electric eye, that prompted the automatic door to close, become de-energized, and lock. (<u>Id.</u>) While the door was being closed and locked, the extractor would remain energized, and continue to move the bale until the limit switch was contacted. (<u>Id.</u>) At the time of the accident, however, the extractor motor was activated by a proximity "trip" switch, and not the electric eye. (Doc. 29, Ex. 4 at 5; Bonner depo. at 47.) In other words, once the bale was pushed out to a certain point, the bale triggered the "trip" switch, which then energized the conveyor belt to finish taking the bale out of the way. (Doc. 29, Ex. 12 at 7, 29; Cramer depo. at 68, 95.)

Just before the accident, the automatic discharge door was open and a completed bale was sitting on the extractor conveyor, immediately in front of the bale with the protruding wire. (Doc. 29, Ex. 12 at 23-25, 27; Cramer depo. at 87-89, 93.) Neither bale was moving, because the baler was not cycling; there was nothing going into the baler. (Doc. 29, Ex. 12 at 24, 27; Cramer depo. at 88, 93.) Ordinarily, a bale moves only when scrap fills the hopper and the ram pushes that scrap forward. (Doc. 29, Ex. 12 at 26; Cramer depo. at 92.) When the baler starts up to cycle the ram, there is a lot of pressure, creating a lot of noise. (Doc. 29, Ex. 12 at 28; Cramer depo. at 94.) Because Cramer did not hear the machine start, he believed the ram did not cycle at the time of the accident. (<u>Id.</u>) Yet, at the time of the accident, the bale that had been in the discharge door was no longer in the door. (Doc. 29, Ex. 12 at 29; Cramer depo. at 95.) Cramer did not know what caused the conveyor belt to engage, move the first bale away from the door, and begin closing the automatic door. (Doc. 29, Ex. 12 at 27-29; Cramer depo. at 93-95.) He guessed that maybe a piece of scrap came off the bale and hit the proximity switch, or that the switch was already close to being activated, and simply engaged. (Doc. 29, Ex. 12 at 28-29; Cramer depo. at 94-95.) Had the bale not moved from its location in the

discharge door, Dr. Blundell stated there would have been no accident. (Doc. 29, Ex. 14 at 19; Blundell depo. at 136.)

The baler was also designed with an alarm system. (Doc. 29, Ex. 5 at 3-4; Herndon depo. at 35-36.) The alarm would sound during the complete operation of the automatic door, including during the bale's extraction and the door's closing. (Id.) However, these alarms were not functioning at the time of the accident. (Doc. 29, Ex. 12 at 30; Cramer depo. at 99.) If the alarms had been working, Dr. Blundell believed that they might have prevented the accident. (Doc. 29, Ex. 14 at 17; Blundell depo. at 127.)

According to Maren's marketing materials, the discharge door was designed to close and lock in twenty-five seconds. (Doc. 29, Ex. 5 at 11; Herndon depo. at 77; Doc. 29, Ex. 20 at 3.) Cramer believed the door was closing in eight to ten seconds at the time of the accident, but acknowledged that this was only a guess, and that he was "a very bad judge of time and distance." (Doc. 29, Ex. 16 at 6; Cramer depo. at 35; Doc. 46, Ex. 12 at 25; Cramer depo. at 98.) When Dr. Sprague inspected the baler, he found the automatic door was closing in five to six seconds, but cautioned that the machine was not properly operating at the time. (Doc. 29, Ex. 17 at 2; Sprague depo. at 90.) By adjusting a hydraulic flow control valve on the machine, operators could change the closing speed of the door. (Doc. 29, Ex. 5 at 12-13; Herndon depo. at 78-79.)

After the accident, Alton Packaging installed a cage around the automatic door and conveyor. (Doc. 46, Ex. 12 at 27; Cramer depo. at 109.)

## VII.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.

<u>Devin</u>, 491 F.3d at 785.  A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party.  <u>Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co.</u>, 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial.  <u>Celotex</u>, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact.  Fed. R. Civ. P. 56(e); <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800 (8th Cir. 2004); <u>Krein v. DBA Corp.</u>, 327 F.3d 723, 726 (8th Cir. 2003).

## VIII.  DISCUSSION

A plaintiff has three theories of recovery under Missouri products liability law: strict liability, negligence, and breach of warranty. <u>Sperry v. Bauermeister, Inc.</u>, 786 F. Supp. 1512, 1516 (E.D. Mo. 1992). The theory of strict liability divides into two sub-categories: liability for defective design, and liability for failure to warn of an inherent defect.  <u>Id.</u>  In his complaint, Cramer has alleged fault in strict liability and negligence, with claims of defective design and failure to warn for each category.

## A.  Strict Liability: Defective Design

To prevail on a strict liability claim of defective design, the plaintiff must prove the product was defective and unreasonably dangerous when put to its reasonably anticipated use, that the defect existed when the product left the manufacturer's control and entered the stream of commerce, and that he sustained his damages as a direct result of that defect.  <u>Sappington</u>, 512 F.3d at 446; <u>Sperry</u>, 786 F. Supp. at 1516; Mo. Rev. Stat. § 537.760.  A product's design is defective when that design renders the product "unreasonably dangerous."  <u>Pree v. Brunswick Corp.</u>, 983 F.2d 863, 865 (8th Cir. 1993).  Juries, and not the courts, give meaning to the concept of "unreasonably dangerous," and they do so by applying their collective insights to the facts and

- 19 -

circumstances presented by the parties. <u>Sappington</u>, 512 F.3d at 446. In other words, the concept of "unreasonably dangerous" should be treated as an ultimate issue for the jury. <u>Id.</u>

The parties may assist the jury in defining "unreasonably dangerous" by presenting evidence that the utility of a design outweighed its risks or that consumer expectations were violated, but such evidence is not required. <u>Id.</u> A plaintiff has no obligation to prove the existence of a reasonable alternative design, or even that the product failed or malfunctioned. <u>Id.</u> On the other hand, the law does not require manufacturers to equip their products with every conceivable safety device. <u>Shaffer</u>, 335 F. Supp. 2d at 997-98. The absence of an available safety feature does not, by itself, mean a product is defective. <u>Id.</u> Depending on the case and the complexity of the machine, expert testimony may be necessary to establish a submissible case of design defect. <u>Bryant v. Laiko Int'l Co.</u>, No. 1:05 CV 161 ERW, 2006 WL 2788520, at *10 (E.D. Mo. Sept. 26, 2006) ("Whether courts have held expert testimony is required usually turns on the complexity of the subject matter, or whether the circumstances clearly show that the incident could not have occurred absent a defect.").

In this case, the #122 baler was a sophisticated, industrial machine, whose operation would be unfamiliar to most jurors. The machine was almost forty feet long, contained chambers, shear points, and conveyors, and operated by way of an electric eye and internal counter. This is not a "simple" case where a defect can be inferred from the circumstantial evidence alone. <u>See</u> <u>Shaffer</u>, 335 F. Supp. 2d at 998 (distinguishing itself from a "simple" case involving an exploding baby bottle). Expert testimony is therefore necessary to establish the baler's design was defective and unreasonably dangerous. <u>See</u> <u>Arnold v. Amada N. Am., Inc.</u>, No. 4:07 CV 198 RWS, 2008 WL 3411789, at *9-*10 (E.D. Mo. Aug. 8, 2008) (finding expert testimony was necessary where plaintiff was claiming a six-ton press brake was defectively designed); <u>Pro Serv. Auto., L.L.C. v. Lenan Corp.</u>, No. 04-587-CV-GAF, 2005 WL 3371054, at *11 (W.D. Mo. Dec. 12, 2005), <u>aff'd</u>, 469 F.3d 1210 (8th Cir. 2006) (finding expert testimony was necessary where plaintiff was claiming a waste oil heater was defectively designed).

Cramer has produced the expert report of Dr. Blundell. Looking to the report, Dr. Blundell is prepared to testify that the baler was unreasonably dangerous because it possessed an unguarded shear point. Relying on this testimony, a jury could find that the baler was defectively designed because it should have had a guard around the shear point. See Anderson v. F.J. Little Mach. Co., 68 F.3d 1113, 1117 (8th Cir. 1995). In Anderson, the expert was prepared to testify that the defendant's machine was defective because it should have had a guard over the nip point. Id. Standing alone, this testimony was "sufficient to defeat summary judgment on the defective design claims." Id. Looking to Anderson, summary judgment is inappropriate on Cramer's strict liability defective design claim.

Maren argues that it designed the baler with a guard around the shear point, and, as a matter of fact, it provided this guard to Alton Packaging. In support, Maren points to engineering drawings that depict a guard around the door, a series of photographs that show an orange cage around the door, and the testimony of Gregory Herndon. In contrast, Cramer has produced affidavits and deposition testimony from James Bonner, Rose Voyles, James Perrine, and George Rogers, all of whom have stated that they never saw a cage or guard around the baler. This conflicting testimony must go before a jury.

Maren also argues that modifications to the baler insulate it from liability. Under Missouri law, a manufacturer is not liable for a product it delivers in a safe condition, but which becomes defective through subsequent mishandling. Mouser, 2000 WL 35552637, at *9. "When a third party's modification makes a safe product unsafe, the seller is relieved of liability even if the modification is foreseeable." Jones v. Ryobi Ltd., 37 F.3d 423, 425 (8th Cir. 1994). By the same token, not every modification demands summary judgment. See Boyer v. Bandag, Inc., 943 S.W.2d 760, 763 (Mo. Ct. App. 1997). If the changes or alterations to a product were foreseeable and did not make the product unsafe, these changes do not relieve the manufacturer of strict liability. Id. The modification must be the sole cause of the damage for the question be one of law. Gomez v. Clark Equip. Co., 743 S.W.2d 429, 433 (Mo. Ct. App. 1987). If the evidence is sufficient to make a submissible case

that the modification was not the superseding cause of a plaintiff's injuries, the case must go to the jury. Id. at 432. Issues relating to proximate cause and intervening efficient cause belong to the jury. Love v. Deere and Co., 684 S.W.2d 70, 75 (Mo. Ct. App. 1985).

Maren argues that third parties made several modifications to the baler. In particular, the company notes that the extractor conveyor was being operated by a proximity switch instead of the electric eye, that the baler's alarms were not functioning at the time of the accident, and that the automatic door was closing at a quicker speed than it was designed to do. Dr. Blundell stated the accident would not have happened, had the bale still been sitting in the door. At the same time, he did not state that the modifications were the sole cause of the accident; he believed the accident was equally possible with the electric eye. (Doc. 32, Ex. 2 at 34; Blundell depo. at 132) ("[I]f you had a electric eye . . . you could have the same effect. . . ."). With respect to the alarms, Dr. Blundell stated that it was "possible" that functioning alarms would have prevented the accident. (Doc. 29, Ex. 14 at 17; Blundell depo. at 127.) There is no expert testimony connecting the accident to the door's modified closing speed. The evidence before the court does not indicate these alterations were the sole cause of the accident. Whether these modifications were the superseding cause of Cramer's injuries remains a question for the jury. See Gomez, 743 S.W.2d at 432.

Looking to the evidence as a whole, a jury could find the baler was defective and unreasonably dangerous because it left the defendant's possession without a guard around the automatic discharge door.[5]

## B. Strict Liability: Failure to Warn

---

[5]As noted above, the #122 baler is a sophisticated, industrial machine, and expert testimony is necessary to establish any defects in its design. Without the benefit of Dr. Blundell's testimony on the subject, Cramer may not maintain that the baler was defective because it lacked an integral guard, lacked an accessible emergency stop, should have had a 3/8-inch gap between the door and the conveyor belt, or exhibited excessive closing pressures. See Arnold, 2008 WL 3411789, at *9-*10 (granting defendant summary judgment on plaintiff's defective design claim in the absence of expert testimony on the subject).

A manufacturer has a duty to warn users when its product is inherently dangerous. <u>Duke v. Gulf & W. Mfg. Co.</u>, 660 S.W.2d 404, 418 (Mo. Ct. App. 1983). The absence of an adequate warning, in itself, renders a product defective or unreasonably dangerous under product liability law. <u>Id.</u> To prevail on a strict liability claim of failure to warn, the plaintiff must prove (1) the defendant sold the product in its course of business, (2) the product was unreasonably dangerous at the time of sale, when used as reasonably anticipated, without knowledge of its characteristics, (3) the defendant failed to adequately warn of the danger, (4) the product was used in a manner reasonably anticipated, and (5) he was damaged as a direct result of the manufacturer selling the product without a warning. <u>Mouser</u>, 2000 WL 35552637, at *12. As part of the causation requirement, the plaintiff must show that his injuries were caused by the product at issue, and that a warning would have altered his behavior. <u>Anderson</u>, 68 F.3d at 1115.

The duty to warn does not arise if the user knows or should know of the potential danger, "especially when the user is a professional who should be aware of the characteristics of the product." <u>Peitzmeier</u>, 97 F.3d at 299. Therefore, as a preliminary inquiry, the court must determine whether adequate information about the danger was already available to the plaintiff, absent any warning. <u>Cole v. Goodyear Tire & Rubber Co.</u>, 967 S.W.2d 176, 184-85 (Mo. Ct. App. 1998). The relevant danger is the <u>specific danger</u> arising out of the alleged defect, and not simply a "general awareness of the danger of machinery. . . ." <u>Duke</u>, 660 S.W.2d at 419. If the evidence is sufficient for a jury to find the plaintiff was not aware of the specific danger at issue, the plaintiff is entitled to the presumption that he would have heeded the warning. <u>Tune v. Synergy Gas Corp.</u>, 883 S.W.2d 10, 14 (Mo. 1994).

In his deposition, Cramer testified that he was aware that the baler operated automatically, and that he knew to keep his body and clothing clear of the machine's moving parts. (Doc. 29, Ex. 12 at 5, 38-39; Cramer depo. at 66, 113-14.) On the other hand, he testified that he had never used the baler with a cage or guard present. (Doc. 29, Ex. 12 at 35; Cramer depo. at 109.) James Perrine, who also worked as a baler, swore that there was never a cage or guard around the

automatic door. (Doc. 46, Ex. 6 at 41-42.) Maren has not pointed to any sign on the baler, warning users to employ a guard when operating the machine.

Reviewing the evidence in the record, there is no indication that Cramer was ever aware of the specific danger related to operating the baler without a cage or guard over the automatic door. See Duke, 660 S.W.2d at 419 (finding that plaintiff's testimony that he never knew "not [to] use the press without guards" indicated he was not aware of the specific danger at issue). Looking to Duke and Cole, Cramer is entitled to the presumption that "he would have heeded a warning had it been given." Cole, 967 S.W.2d at 185. This presumption gives Cramer a submissible case on his failure to warn claim. See Tune, 883 S.W.2d at 14.

## C. Negligence: Design Defect

In a products liability case founded in negligence, the plaintiff must prove the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform this duty, and that this failure proximately caused the plaintiff's injury. Morrison v. Kubota Tractor Corp., 891 S.W.2d 422, 425 (Mo. Ct. App. 1994). The extent of a manufacturer's duty to protect against a dangerous product depends on the nature and character of the defect, and on the plaintiff's knowledge of such a defect. Stevens v. Durbin-Durco, Inc., 377 S.W.2d 343, 347 (Mo. 1964). "[T]he manufacturer may be held liable if the defect or danger is latent or concealed, but where the danger is open, obvious and apparent, or the user has actual knowledge of the defect or danger, there is no liability on the manufacturer." Id. The "open and obvious" limitation primarily concerns those dangers that are visible. Thompson v. Brown & Williamson Tobacco Corp., 207 S.W.3d 76, 99-104 (Mo. Ct. App. 2006). Whether a manufacturer owes the plaintiff any duty to protect is a question of law, reserved for the court. Morrison, 891 S.W.2d at 425.

Cramer alleges that his injuries were a result of Maren's negligent design of the baler. Based on Dr. Blundell's admitted testimony, the design defect concerns the presence of an unguarded shear point created

by the discharge door and conveyor belt.  This hazard was obvious.  In his deposition, Cramer acknowledged that the dangers of the automatic door were a matter of "common sense." (Doc. 29, Ex. 12 at 38; Cramer depo. at 113.)  He was equally aware of the dangers of the conveyor belt; he knew there was "no reason to be on that conveyor." (Doc. 29, Ex. 12 at 39; Cramer depo. at 114.)  Finally, he recognized that being on a moving conveyor between moving parts was a dangerous position to be in.  (Doc. 29, Ex. 12 at 40; Cramer depo. at 115.)

These dangers were plainly visible.  Unlike chemicals or other toxins, the dangers of moving machine parts are apparent to the naked eye.  See Gamradt v. Fed. Labs., Inc., 380 F.3d 416, 420-21 (8th Cir. 2004).  The absence of a door guard or cage does nothing to change the obviousness of these dangers.  Without a cage surrounding and obscuring the sheer point, these dangers were arguably more visible and more prominent.  Indeed, Missouri courts have found unguarded machine parts and missing safety features to be open and obvious dangers in a number of cases.  See Counts v. MK-Ferguson Co., 862 F.2d 1338, 1340 (8th Cir. 1988) ("The deposition testimony clearly established that the lack of permanent guards over the access holes was open and obvious, rather than hidden."); Kerber v. Am. Mach. & Foundry Co., 300 F. Supp. 1205, 1207 (W.D. Mo. 1968), aff'd, 411 F.2d 419 (8th Cir. 1969) ("[W]hen the machine was operating with the shield removed the danger was open, obvious and apparent and under the above authority, no liability attached therefor."); Stevens, 377 S.W.2d at 348 ("The perilous nature of the product was obvious and apparent to plaintiff; its lack of a safety ratchet was plain to be seen."); Morrison, 891 S.W.2d at 427-28 ("If the absence of a [roll over protective system] is to be regarded as a design defect, it is a defect that is patent beyond doubt.  Such an open and obvious lack of this safety feature on the tractor . . . is not actionable under the negligence law of Missouri. . . .").  Looking to Missouri case law, the unguarded sheer point was an open and obvious danger, for which there is no liability on the part of the manufacturer.


**D.  Negligence: Failure to Warn**

A manufacturer has a duty to warn ultimate users that one of its products is inherently dangerous, or is dangerous because of the use to which it will be put. <u>Spuhl v. Shiley, Inc.</u>, 795 S.W.2d 573, 577-78 (Mo. Ct. App. 1990). That said, a manufacturer has no duty to warn of dangers that are open and obvious, or of dangers that are commonly known. <u>Winn ex rel. Winn v. Pollard</u>, 62 S.W.3d 611, 618 (Mo. Ct. App. 2001). When a danger is open and obvious, the "failure to so warn is not the proximate cause of a subsequent injury." <u>Id.</u> Because the danger in this case was open and obvious, Cramer cannot prevail on his claim of negligent failure to warn.

## IX. PUNITIVE DAMAGES

Maren Engineering moves for summary judgment on the issue of punitive damages. In turn, Cramer has moved to voluntarily dismiss, without prejudice, ¶ 20 and ¶ 27 of his complaint. Because these two paragraphs asserted claims for punitive damages, Cramer's entitlement to punitive damages is now moot.

## X. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of Maren Engineering to exclude the testimony and expert report of Dr. James Blundell (Doc. 31) is granted in part, and denied in part. Dr. Blundell's testimony concerning the proposed safety modifications is excluded, but his testimony concerning the danger of an unguarded shear point is admitted.

**IT IS FURTHER ORDERED** that the motion of defendant Maren Engineering Corp. for summary judgment (Doc. 28) is granted in part, and otherwise denied. Maren Engineering is not entitled to summary judgment on Cramer's strict liability claims, but is entitled to summary judgment on Cramer's negligence claims.

**IT IS FURTHER ORDERED** that the motion of plaintiff Donald Raymond Cramer, III, to voluntarily dismiss ¶ 20 and ¶ 27 of his complaint (Doc. 44) is granted. These paragraphs are dismissed without prejudice.

**IT IS FURTHER ORDERED** that the motion of defendant Maren Engineering for summary judgment on the issue of punitive damages (Doc. 33) is denied as moot.

_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on October 19, 2009.